# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

CASE NO. 10-4859 (PAM/TNL)

RODNEY P. GRIMM,

Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner of Social Security,

Defendant.

# REPORT & RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT

Edward C. Olson, Attorney at Law, 331 2nd Avenue South, Suite 420, Minneapolis MN 55401, for Plaintiff.

David W. Fuller, Assistant United States Attorney, 600 United States Courthouse, 300 South Fourth Street, Minneapolis MN 55415, for Defendant.

## I.   INTRODUCTION

Plaintiff Rodney P. Grimm (Plaintiff) brings the present action, disputing Defendant Commissioner of Social Security's denial of his protective application for disability insurance benefits (DIB). This matter is before the Court, Magistrate Judge Tony N. Leung, for a report and recommendation to United States District Court Judge Paul A. Magnuson on the parties' cross motions for summary judgment. *See* 28 U.S.C. § 636(b)(1); D. Minn. LR 72.1-2.

Based on the reasons set forth herein, this Court **RECOMMENDS** that Plaintiff's Motion for Summary Judgment (Docket No. 12) be **DENIED**; and the Commissioner's Motion for Summary Judgment (Docket No. 14) be **GRANTED**.

## II.   FACTS

### a.  Procedural Posture

Plaintiff was born in 1957 and was 49-years old on April 12, 2007, when he filed his application for DIB.[1] Tr. 9.  Plaintiff alleged a disability onset date of November 26, 2007.[2]  Tr. 9.  Plaintiff's applications were denied.  Tr. 9, 52, 53, 56, 59, 60, 70, 71, 78, 80.  Thereafter, Plaintiff requested a hearing before an Administrative Law Judge (ALJ). Tr. 9, 37, 83.  On October 22, 2009, Plaintiff had a hearing before Administrative Law Judge David K. Gatto.  Tr. 15, 23-36 (transcript), 100, 105.

In his opinion, dated December 21, 2009, the ALJ found and concluded as follows:  Plaintiff had not engaged in substantial gainful activity since November 26, 2007. Tr. 6, 11.  Plaintiff has the following "severe impairments" under 20 C.F.R. § 404.1520(c): "Status post arthroscopy with right knee medial meniscus tear, coronary artery disease, and degenerative disc disease of the lumbar spine." Tr. 11. Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments of 20 C.F.R. Pt. 404, Subpt. P, App. 1. Tr. 12. Plaintiff has

---

[1] Plaintiff's 2007 application is an amended application.  The record includes an application for DIB and supplemental security income, both dated December 23, 2004. Tr. 121-28; *see also* Tr. 129-142 (application for DIB, dated April 26, 2007).

[2] Plaintiff's initial alleged onset date was October 1, 2004. Tr. 121-28; *see also* Tr. 129-42. Plaintiff later amended the alleged onset date. Tr. 9.

the residual functional capacity (RFC) to perform "light work" under 20 C.F.R. § 404.1567(b), with only occasional kneeling and no climbing ladders, ropes, or scaffolds, and no exposure to extreme cold. Tr. 12. In reaching his RFC assessment, the ALJ considered the objective medical evidence and Plaintiff's course of treatment as follows:

> [Plaintiff] is impaired by status post arthroscopy (November 2002 and October 2004) and right knee medial meniscus tear, examinations have noted some swelling but [Plaintiff] has good range of motion and is able to ambulate effectively without an assistive device; coronary artery disease is classified as mild without high grade lesion greater than 20% and with normal left ventricular systolic function with an ejection fraction of 65%; and degenerative disc disease of the lumbar spine without neurological, sensory, or motor deficits, and with allegations, by [Plaintiff], that back pain was only aggravated by heavy work and did not restrict his activities. . . .

Tr. 12-13. In reaching his RFC assessment, the ALJ also stated as follows:

> As for the opinion evidence in restricting [Plaintiff's] to the performance of light work the undersigned has given significant weigh to the opinion of the State agency medical consultants.   The opinion of the State agency medical consultants is generally consistent with the above-described residual functional capacity though the undersigned has further restricted the claimant to never climbing ladders, ropes, or scaffolds and found him capable of frequent crawling consistent with the overall evidence of record . . . .
>
> The undersigned has also considered but not given controlling weight to the opinion of Dr. Malkovich, a treating physician, . . . as it is not well supported by clinical findings, laboratory diagnostic techniques, and is not consistent with other substantial evidence of record.  It was the opinion of Dr. Malkovich that the claimant is capable of performing a modified range of sedentary work. . . . However, [Plaintiff] testified he supplied information, regarding his functional limitations, to Dr. Malkovich during his appointment, these restrictions   are   not   consistent   with   other   subjective

3

> reports . . . , they are not consistent with treating records, not
> supported by other objective findings, inconsistent with
> activities of daily living, and based on subjective reports with
> the claimant lacking credibility.

Tr. 13.

The ALJ further found and concluded as follows: Plaintiff is unable to perform his past relevant work. Tr. 14. Plaintiff was an "an individual approaching advanced age," as defined by 20 C.F.R. § 404.1563, on the alleged onset date. Tr. 14. Considering Plaintiff's age, education work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. Tr. 14. Therefore, Plaintiff has not been under a disability within the meaning of the Social Security Act from November 26, 2007 through December 21, 2009. Tr. 15.

Plaintiff requested a review of the ALJ's decision. Tr. 37. After receiving additional evidence, the Appeals Counsel denied Plaintiff's request for review on October 20, 2010. Tr. 1, 4-5. Thereafter, Plaintiff initiated the present action and moved for summary judgment, arguing that the ALJ's RFC assessment and the ALJ's conclusion that Plaintiff retains the ability to work are not supported by substantial evidence in the record as a whole. Pl.'s Mem. at 16-17, June 3, 2011. Plaintiff seeks an order reversing the decision of the ALJ and awarding Plaintiff benefits or, in the alternative, Plaintiff seeks an order remanding to the Commissioner of Social Security for proper findings regarding Plaintiff's RFC and a proper hypothetical question. *Id.* at 17.

### b.  Employment Background

From 1989 to 2004, Plaintiff worked doing highway maintenance for the Department of Transportation. Tr. 173. In this position, Plaintiff, among other things, plowed snow, filled potholes, shoveled, and removed debris from the highway. Tr. 173. Plaintiff needed the full panoply of physical skills to perform his job. Tr. 173. Plaintiff sometimes had to lift 100 pounds or more, and Plaintiff frequently lifted 60 pounds. Tr. 174. Plaintiff has an earning history extending back to 1973. Tr. 147-48. Between 1997 and 2004, Plaintiff earned at least $34,000 per year. Tr. 148.

### c.  Medical Records

#### i.  Medical Records: 2002 - 2003

On March 12, 2002, Plaintiff saw Dr. David McKee, and complained about stiffness and paresthesias in his fingers. Tr. 363. Dr. McKee found no convincing evidence of any focal injury in the nerves of Plaintiff's upper extremities. Tr. 363. On March 18, 2002, Plaintiff was seen for a carpel tunnel release. Tr. 358. It was noted that there were no signs to support a carpel tunnel release. Tr. 358.

On August 12, 2002, Plaintiff saw Dr. T.E. Osborne. Tr. 358. Plaintiff reported knee pain after kneeling extensively at work. Tr. 358. Dr. Osborne examined Plaintiff and was concerned that Plaintiff had a meniscal derangement. Tr. 348. Plaintiff was recommended conservative treatment, including activity modification. Tr. 358.

On October 4, 2002, Plaintiff saw Dr. D.R. Malkovich and reported pain in his right knee. Tr. 358. Dr. Malkovich diagnosed Plaintiff with a probable cartilage tear. Tr.

358. On October 7, 2002, Plaintiff underwent magnetic resonance imaging (MRI) of his

right knee. Tr. 362. The MRI revealed a medial meniscus tear. Tr. 362.

On October 16, 2002, Dr. Malkovich wrote to Dr. Timothy L. McLeod. Tr. 329.

Dr. Malkovich wrote, in part, as follows:

> [Plaintiff] does a lot of driving of trucks, also a lot of kneeling, and his outside job is concrete finishing which requires a lot of time on his knees. In August, he began developing pain in his right knee, which has persisted. . . . [Plaintiff] . . . was in the Air Force in 1978, he developed swelling in both knees from crawling on his knees. He remembers having fluid drawn off one or both knees at that point in time . . . .

> On examination, he walks with a normal gait. His range of motion on the right is full extension . . . . On palpitation, he has medial joint line tenderness in the right knee. Ligaments are stable in both knees and equal from side to side.

> . . . The MRI was reviewed showing an oblique tear of the posterior horn and mid portion of the medial meniscus.

Tr. 329.

On November 13, 2002, Plaintiff saw Dr. McLeod. Tr. 313, 361. Plaintiff

underwent a MRI in November 2002, which was consistent with the "August 7, 2002"

MRI.[3] Tr. 314, 361. Plaintiff later underwent arthroscopic surgery on his right knee. Tr.

310-12, 331-32.

On December 2, 2002, Plaintiff saw Dr. McLeod post-surgery. Tr. 334. Dr.

McLeod concluded that Plaintiff's knee was clinically benign and that Plaintiff "may

begin working off of his crutches and may start some gentle biking and exercise in the

---

[3] This Court presumes that August 7, 2002 is a misreading of October 7, 2002.

pool." Tr. 334. Dr. McLeod also instructed Plaintiff to not go back to work until after January 1, 2003.[4] Tr. 334.

On January 6, 2003, Plaintiff reported that he has been doing well and only had pain when he was recently carrying a 100-pound calf. Tr. 335. Plaintiff reported that he could not kneel and climbing stairs caused him some discomfort. Tr. 335.  Dr. McLeod concluded that Plaintiff could return to work on January 13, 2003, with no restrictions. Tr. 335.

On February 27, 2003, Plaintiff saw Dr. McLeod. Tr. 333, 407. Plaintiff also reported that "he is back to work and doing most all activities. Kneeling on his knee causes discomfort." Tr. 333, 407. Plaintiff reported that he was doing heavy work clearing trees and developed some soreness in his right knee. Tr. 333, 407. Plaintiff also reported that he felt instability beneath his knee cap "when he trie[d] to jog." Tr. 333, 407. Dr. McLeod noted that Plaintiff was walking with a normal gait and had full extension. Tr. 333, 407.

### ii.  Medical Records: 2004 - 2005

On July 2, 2004, Plaintiff saw Dr. Malkovich. Tr. 356, 452. Plaintiff reported pain and swelling in his knee. Tr. 356, 452. Plaintiff further reported that he had been "okay for a couple years, but now [was] having an increased problem." Tr. 356, 452. Dr. Malkovich reviewed an x-ray which revealed no calcium deposits or arthritis in Plaintiff's knee. Tr. 356, 452.

---

[4] In December 2002, Dr. McLeod wrote a prescription for Plaintiff, which stated: "No work until re-evaluated at next appt, 1/6/03." Tr. 322.

On July 15, 2004, Plaintiff underwent an MRI of his right knee. Tr. 315, 359, 410. The MRI revealed that Plaintiff's knee had an oblique tear, involving the posterior horn of the medial meniscus, and a small joint effusion, with a small Baker's cyst. Tr. 315, 359, 410. It was noted that compared to 2002 there was little change in the oblique tear along the posterior horn of the medial meniscus. Tr. 315, 359, 410.

On July 22, 2004, Dr. McLeod wrote to Dr. Malkovich:

> [Plaintiff] had a good result after [the] procedure [in November 2002] and returned to work. He has been working, doing a lot of hauling and work on his feet, and has developed recurrence of pain in his right knee. . . .
>
> Today . . . [Plaintiff] says . . . if he is on his feet all day working, his knee is swollen at the end of the day. . . .

Tr. 327, 402-03. Dr. McLeod diagnosed Plaintiff with an abnormal signal in the medial meniscus, and noted that Plaintiff did not want to have surgery because "[i]f he [was] able to modify his work to eliminate heavy use of the right leg, he may be able to control the pain and symptoms with Motrin, which he [was] currently taking." Tr. 327, 402-03.

On August 4, 2004, Plaintiff saw Dr. Malkovich. Tr. 355, 451. Plaintiff reported that he was having difficulty with right knee effusion and "what sounds like a Baker's cyst whenever he does any ambulation or work." Tr. 355, 451. But, Dr. Malkovich concluded that Plaintiff looked fairly good. Tr. 355. 451. On August 4, 2004, Dr. Malkovich completed a "Report of Work Ability." Tr. 194. The report noted as follows: Plaintiff can carry up to 20 pounds continuously, but cannot carry more than 20 pounds; Plaintiff can push and pull up to 25 pounds continuously; Plaintiff can sit and drive continuously, but Plaintiff can stand and walk less than one hour; and Plaintiff can use his

8

upper extremities continuously. Tr. 194. The report noted that Plaintiff's permanent disability was "undetermined." Tr. 194.

On September 14, 2004, Plaintiff saw Dr. Malkovich, who concluded that Plaintiff had an effusion on his right knee. Tr. 355, 451. Dr. Malkovich noted that when Plaintiff rested his knee he had no pain. Tr. 355, 451. Dr. Malkovich also noted that "[a]t the end of the day, he ha[d] pain in his right knee and with effusion increasing and sometimes it lock[ed]." Tr. 355, 451. Dr. Malkovich recommended light duty at work. Tr. 355, 451. Dr. Malkovich also completed a second "Report of Work Ability." Tr. 195. The report is substantially similar to the previous "Report of Work Ability," with the exception that the report noted that Plaintiff cannot lift or carry any weight. Tr. 195.

On October 5, 2004, Plaintiff underwent a second arthroscopic surgery on his right knee.  Tr. 318, 413.  Dr. McLeod noted that since July 2004, Plaintiff has been "doing a lot of working, hauling, and working on his feet and had developed right knee pain."  Tr. 319, 414. Dr. McLeod noted that Plaintiff had "an extensive amount of scarring in the anterior compartment infrapatellar region of the right knee, bordering on a cyclops type of lesion and a torn posterior horn medial meniscus, free margin tears of the lateral meniscus." Tr. 336, 405. On October 8, 2004, Plaintiff was seen after his surgery. Tr. 405. His knee was only slightly swollen and it was noted that he needed to work on full extension. Tr. 405.

On October 11, 2004, Dr. McLeod wrote a prescription, which stated: "Off work for 6-8 weeks due to knee surgery." Tr. 325, 401. On October 25, 2004, Plaintiff again saw Dr. McLeod, who noted that Plaintiff had full extension and flexion in his right knee.

Tr. 336, 405. Plaintiff noted that his left knee was hurting from weight bearing. Tr. 336, 405.

On November 8, 2004, Plaintiff saw Dr. McLeod. Tr. 335, 406. Dr. McLeod noted that Plaintiff was walking without crutches, reported no pain in his right knee when he walked, had full extension and flexion. Tr. 335, 406. Dr. McLeod stated that Plaintiff would be cleared for work on December 1, 2004, with "restrictions about heavy use," carrying over 50 pounds, or repeated jumping on the right knee and leg.[5] Tr. 335, 406.

On November 15, 2004, Plaintiff saw Dr. Malkovich. Tr. 355, 451. Dr. Malkovich noted that he had decreased swelling and with rest Plaintiff's knee improved. Tr. 355, 451. Dr. Malkovich recommended "continued restriction" and Plaintiff was to "avoid kneeling, deep squats, and deep flexion of his knee." Tr. 355, 451. On November 15, 2004, a Report of Workability was completed for Plaintiff. Tr. 347.  The form noted that Plaintiff's injury was work related and his disability was "likely" permanent. Tr. 347. The Report of Workability stated that Plaintiff can lift up to 40 pounds frequently. Tr. 347. The Report of Workability also stated that Plaintiff could not frequently kneel, crawl, or climb a ladder. Tr. 347.

On December 6, 2004, Dr. McLeod wrote to the Minnesota Department of Transportation on Plaintiff's behalf. Tr. 338. Dr. McLeod noted as follows: Plaintiff "lost portions of his medial meniscus," but the prognosis for his knee was good "as long as he [was] not overusing or abusing his knee with activity involving his knee." Tr. 338.

---

[5] On November 8, 2004, Dr. McLeod wrote a prescription, which stated: "Patient may return to work on 1 Dec. 2004." Tr. 326.

Plaintiff's condition would be aggravated by performing the work of a "Transportation Generalist"[6] because it required the heavy use of his right knee. Tr. 338. Plaintiff's condition would be permanent. Tr. 338. Plaintiff's workday should be limited to eight hours per day; Plaintiff would be able to walk outside in four to six weeks; Plaintiff cannot jump; and any ladder climbing or entering his equipment will likely aggravate his knee. Tr. 338. Dr. McLeod recommended that Plaintiff be permanently reassigned to a different work activity. Tr. 338. On December 6, 2006, Plaintiff also spoke with Dr. Peter G. Goldschmidt and Plaintiff reported that a recent corticosteriod injection gave him no significant relief. Tr. 389.

On December 15, 2004, Plaintiff saw Dr. McLeod. Tr. 335, 406. Plaintiff reported that he did not return to work on December 1, 2004, because his employer would not modify his job. Tr. 335, 406. Plaintiff reported that his employer placed him on unpaid medical leave for up to one year. Tr. 335, 406. Dr. McLeod told Plaintiff "that we [could ]not extend his short term disability based on his right knee, which today [was] clinically benign, show[ed] full extension, flexion to 120 degrees." Tr. 335, 406. Dr. McLeod noted that Plaintiff remained cleared to work as of December 1, 2004. Tr. 335, 406.

On December 17, 2004, Plaintiff saw Dr. Malkovich. Tr. 355, 451. Plaintiff reported that he twisted his knee and requested a brace. Tr. 355, 451. Dr. Malkovich

---

[6] The record includes an exhaustive "Job Analysis," or job description, for Transportation Generalist, which includes the amount of each day spent doing various activities. Tr. 339-46. The Transportation Generalist position requires extensive motion. Tr. 340.

observed an effusion and diagnosed Plaintiff with a cartilage tear, chronic effusion, and a knee twist. Tr. 355, 451.

On June 20, 2005, Plaintiff was seen by Dr. Malkovich for a suspected broken rib. Tr. 450. Plaintiff injured his rib while working on a ledge. Tr. 450. Dr. Malkovich also noted that Plaintiff had a swollen right knee with effusion. Tr. 450.

On June 21, 2005, Plaintiff underwent an MRI of his right knee which showed tiny joint effusion and a tear in the posterior horn of the medial meniscus extending to the mid portion. Tr. 416, 456.

On June 29, 2005, Plaintiff saw Dr. G. Douglas Ritts. Tr. 391. Plaintiff reported that he was currently on medical leave and he could not go back to work because his knee swelled with increased activity around his house or after walking. Tr. 391. Dr. Ritts noted that Plaintiff had an MRI done this past week which showed significant residual tearing of the medial meniscus of his right knee. Tr. 391. The MRI also showed mild narrowing of the patellofemoral and compartments mild medial and lateral narrowing in the femoral tibial inner space of his right knee. Tr. 391. Dr. Ritts noted that Plaintiff had "a lot of symptoms, mechanically and swelling." Tr. 391. Dr. Ritts also noted that on examination, Plaintiff had tenderness and mild pain, but no instability, only mild swelling, "0 to 120 ° range of motion," "no specific limp," intact reflects, no atrophy, and "good strength." Tr. 319.

On July 22, 2005, Plaintiff saw Dr. Malkovich. Tr. 450. Dr. Malkovich noted that Plaintiff continued to have effusion on his knee and he was "still on limited activity at work." Tr. 450.

On August 11, 2005, Dr. McLeod wrote to Dr. Malkovich and stated as follows:

> We saw [Plaintiff] . . . today. . . . He says that he has been
> retired on disability retirement by the state because there was
> no light duty available for him.  He said in January his right
> knee started to swell and he is complaining of pain . . . . He is
> not working at this time but his insurance company is trying
> to locate a bench-type sit down job for him.
>
> On examination today, he has full extension of his right
> knee . . . . There is a very small effusion present in the join.
> The ligaments are stable. . . . I do not believe he has a new
> tear of the medial meniscus.
>
> I would not recommend surgery. . . . [H]opefully he can
> secure some type of work that does not require him to be on
> his feet full time. He is developing some medial compartment
> osteoarthritis but it is not severe enough to warrant
> arthroscopy or other surgery at this point. . . .

Tr. 404.

### iii.  Medical Records: 2006 - 2007

On January 17, 2006, Plaintiff saw Dr. Malkovich. Tr. 449. Plaintiff reported

continued pain in his right knee. Tr. 449. Plaintiff requested another MRI, but Dr.

Malkovich did not feel it would be worthwhile. Tr. 449.

On January 19, 2006, Plaintiff saw Dr. McLeod. Tr. 408. Dr. McLeod wrote to Dr.

Malkovich that Plaintiff continued to have pain and swelling in his right knee. Tr. 408.

Dr. McLeod found no effusion in Plaintiff's right knee and noted that Plaintiff had full

extension and flexion to 130 degrees. Tr. 408.

On January 26, 2006, Plaintiff saw Dr. McLeod. Tr. 409. Dr. McLeod noted that

Plaintiff had an MRI on January 23, 2006, which again showed the oblique tear in the

posterior horn of the medial meniscus and it also showed a small cyst at the posterior

aspect of the meniscus. Tr. 409; *see* Tr. 417. But, the noted tear was not changed from the MRI from June of 2005. Tr. 409. After examining Plaintiff, Dr. McLeod noted that Plaintiff had good range of motion. Tr. 409. Dr. McLeod also noted Plaintiff had no effusion in the knee joint, but Plaintiff reported that "if he [was] on his feet all day there [would] be some swelling." Tr. 409. Plaintiff also reported that Motrin helped his knee pain. Tr. 409.

On February 15, 2006, Plaintiff underwent radiology examination of his spine, which revealed mild spurring at L1-L2, possible limbus vertebra at L4, disc space narrowing, spurring, and aclerosis at L5-S1. Tr. 544. Based on these observations, Plaintiff was diagnosed with degenerative disc disease, most marked at L5-S1. Tr. 544.

On August 16, 2006, Plaintiff saw Dr. Teodoro Romana. Tr. 562. Plaintiff reported that he was "currently on permanent disability form the highway department for recurrent right knee meniscal tear and several arthroscopic surger[ies]." Tr. 651. Plaintiff reported that he gets back pain, which "flares up with heavy physical activities," but Plaintiff never gets sciatic pains or numbness in his legs. Tr. 651. Plaintiff reported that he had significant pain, which worsened after "a lot of weight bearing." Tr. 561. Plaintiff also reported that his pain was "mostly tolerable after taking [over-the-counter] ibuprofen." Tr. 562. Dr. Romana diagnosed Plaintiff with low back syndrome, medial meniscal tear of the right knee, and mild hypertension. Tr. 563. On August 26, 2006, Plaintiff underwent an examination, which revealed L5-S1 degenerative changes and "mild right knee degenerative findings." Tr. 579.

14

On September 25, 2006, Plaintiff saw Dr. Romana. Tr. 557. Plaintiff reported that he had pain in his knees and back, but his medications helped alleviate the pain in his knees. Tr. 557. Plaintiff's description of the pain in his back was vague and Plaintiff stated the pain was neither severe nor "stopped him from doing what he ha[d] to do." Tr. 557. Dr. Romana diagnosed Plaintiff with low back pain syndrome, degenerative disc disease, and a meniscal tear of his knee. Tr. 559.

On October 6, 2006, Plaintiff saw Dr. Malkovich. Tr. 449. Plaintiff reported that his knee was giving him problems. Tr. 449. Dr. Malkovich noted mild effusion, but also noted that Plaintiff's flexion and extension were "okay." Tr. 449. Dr. Malkovich instructed Plaintiff to give his knee rest and limit his activity. Tr. 449.

On November 2, 2006, Plaintiff underwent an MRI of his right knee. Tr. 419, 454. The MRI revealed a stellate tear along the undersurface of the posterior horn of the medial meniscus and a parameniscal cyst that had slightly increased in size. Tr. 419, 454. Plaintiff also underwent an MRI of his left knee, which was normal. Tr. 454.

On November 14, 2006, Plaintiff saw Dr. Goldschmidt. Tr. 390, 453. Dr. Goldschmidt noted that Plaintiff's recent MRI was consistent with the MRI done in January of 2006. Tr. 390, 453. Dr. Goldschmidt diagnosed Plaintiff with persistent right knee pain, with an MRI consistent with medial meniscal tear. Tr. 390, 453. Plaintiff received a corticosteroid injection in his right knee. Tr. 390, 453.

On December 16, 2006, Plaintiff was seen in the emergency department for tightening in his chest. Tr. 421-30, 533-43. Plaintiff was admitted overnight for an angiogram to treat Plaintiff's angina. Tr. 428.  Plaintiff underwent a chest scan, which

revealed benign three centimeter calcification in the anterior mediastinum and diffuse hepatic fatty infiltration. Tr. 430. On December 18, 2006, Plaintiff underwent a left heart catheterization, left ventricular angiography, and selective coronary angiography. Tr. 394. The report from the procedure noted that Plaintiff had a mild diffuse epicardial coronary artery disease in his left circumflex, his left anterior descending had mild diffuse disease, and partially calcified noncardiac mass. Tr. 394.

On January 2, 2007, Plaintiff saw Dr. D.D. Luehr. Tr. 448. Plaintiff complained of shortness of breath.  Tr. 448.  It was recommended that Plaintiff get a CT scan. Tr. 448. On January 4, 2007, Plaintiff had a CT scan of his chest, which showed a benign three centimeter calcification and diffuse hepatic fatty infiltration. Tr. 531. On January 30, 2007, Plaintiff was seen for a follow-up. Tr. 447. Plaintiff reported that overall he was doing well. Tr. 447. It was concluded that Plaintiff had a three centimeter calcification on the anterior mediastinum and Plaintiff had a slightly fatty liver. Tr. 447.

On March 19, 2007, Plaintiff saw Dr. Malkovich. Tr. 447. Dr. Malkovich noted that Plaintiff's angiogram revealed that Plaintiff had only peripheral and 20 percent obstructions. Tr. 447. Dr. Malkovich noted that Plaintiff had serious knee problems which limited his ability to exercise. Tr. 447. Dr. Malkovich noted that Plaintiff had difficulty walking during his cardiac rehabilitation program. Tr. 447. Plaintiff reported that he did not think that he could ride a bike. Tr. 447. Plaintiff was prescribed water exercise and nitroglycerin. Tr. 447.

On March 24 and 29, and April 5, 12, 17, 19, 24, and 26, Plaintiff underwent physical therapy for his osteoarthritis and pain in his right knee. Tr. 434-442. On May 15,

2007, Plaintiff "was attacked by a chicken that leapt from the rafters onto his head," and Dr. Malkovich concluded that, during Plaintiff's effort to fend off the attack, "the chicken must have ruptured some of the ligaments around the extensor" of Plaintiff's hand. Tr. 446.

### iv.  Medical Records: 2008 - 2010

On January 18, 2008, Plaintiff saw Dr. Malkovich. Tr. 505. Plaintiff reported chronic knee pain. Tr. 505. Plaintiff was prescribed Lortab. Tr. 505. On January 18, 2008, Dr. Malkovich completed a form, entitled "Medical Opinion Re: Ability to Do Work-Related Activities (Physical)." Tr. 500. Dr. Malkovich concluded as follows: Plaintiff could *occasionally* carry less than ten pounds; Plaintiff could *frequently* carry less than ten pounds[7]; Plaintiff could stand less than two hours during an eight-hour day; Plaintiff could sit more than six hours in an eight-hour day; and Plaintiff did not need the opportunity to change positions at will. Tr. 500-01. Dr. Malkovich further noted that Plaintiff could only occasionally twist, bend, and repeat foot controls, and Plaintiff could never crouch, climb stairs, or climb ladders. Tr. 501. Dr. Malkovich summed up Plaintiff's limitations by stating that Plaintiff cannot stand. Tr. 501. Dr. Malkovich noted that the medical findings that supported plaintiff's limitations were the fact that he had no cartilage in both knees, torn meniscus, and arthritis, as shown by his MRI's and exams. Tr. 501-02.

---

[7] It is unclear to the Court what Dr. Malkovich meant when he concluded that Plaintiff could both *occasionally* and *frequently* carry less than ten pounds.

In May 2008,[8] Plaintiff saw Dr. Malkovich. Tr. 449. Plaintiff complained of knee pain and effusion, and Dr. Malkovich noted mild tenderness of the medial edge of the joint space. Tr. 449. It was noted that Plaintiff "continues on disability." Tr. 449.

On August 7, 2008, Plaintiff saw Dr. Malkovich. Tr. 520. Plaintiff reported that he was concerned about carpal tunnel syndrome and Dr. Malkovich concluded "what he really wanted was wrist splints." Tr. 520. They discussed knee replacement, and Dr. Malkovich opined that while Plaintiff "really needed it, . . . he is rather young for it." Tr. 520.

On August 12, 2008, Plaintiff was seen in the emergency room because he had a foreign body lodged in his eye following lawn mowing. Tr. 527.

On October 17, 2008, Plaintiff saw Dr. Malkovich. Tr. 520. Dr. Malkovich diagnosed Plaintiff with arthritis in his knees and instructed that Plaintiff "should continue off work with rest and taking anti-inflammatory." Tr. 520.

On March 31, 2009, Plaintiff saw Dr. Malkovich. Tr. 520. Plaintiff complained of his hands being numb. Tr. 520. Dr. Malkovich concluded that Plaintiff had carpal tunnel syndrome. Tr. 520. On April 17, 2009, Plaintiff saw Dr. David McKee. Tr. 511. Plaintiff underwent a nerve conduction study following his complaints of pain in his upper extremities. Tr. 511. The nerve conduction studies revealed "very mild" carpal tunnel syndrome in both hands and "no evidence" to "correlate to [Plaintiff's] subjection complaints." Tr. 511. On April 22, 2009, Plaintiff saw Dr. B.E. Modin for paresthesias

---

[8] The date for this appointment is difficult to read. This appointment visit may be from 2006.

18

and pain in his hand. Tr. 525. After a thorough examination, Dr. Modin diagnosed Plaintiff with mild early carpal tunnel syndrome with symptoms controlled with splinting. Tr. 526.

On April 28, 2009, Plaintiff saw Barbara Kuzenski, CNP. Tr. 553. Plaintiff reported that "he was on activity/lifting restrictions and medical retirement." Tr. 555. Plaintiff also reported that he had no "pain at rest," but "when he [was] done walking around . . . his knees [would] hurt." Tr. 554. After her examination, Ms. Kuzenski concluded that Plaintiff's hypertension was controlled with medication. Tr. 555. Ms. Kuzenski administered the Depression Screening PHQ-2, which resulted in a score of "0" or "a negative screen for depression." Tr. 555-56.

On August 31, 2009, Plaintiff saw Dr. Malkovich. Tr. 566. Plaintiff reported that his leg pain and carpal tunnel syndrome often prevented him from sleeping. Tr. 566. Dr. Malkovich noted that, although Dr. McKee told Plaintiff that he did not need surgery, Dr. Malkovich thought that Plaintiff "should have surgery anyhow." Tr. 566.

On October 6, 2009, Plaintiff saw Dr. Wolcott Holt. Tr. 575. Plaintiff reported awakening three times per night with his hands being numb, swollen, and tender. Tr. 575. Dr. Holt noted that Plaintiff had a recent electromyographic study, which showed "abnormalities, the severity of which was not clear." Tr. 575. Plaintiff reported that he was currently "retired with disability and on Social Security from the Department of Transportation." Tr. 576. Dr. Holt diagnosed Plaintiff with "fairly significant carpal tunnel. Tr. 576.

On November 20, 2009, Plaintiff saw Dr. Holt. Tr. 572. Plaintiff reported that he was waking up two to three times per night and his hands were numb. Tr. 572. Plaintiff reported that "[w]hen he used a planer or a sander it definitely accentuates his symptoms as well as driving a car." Tr. 572. Dr. Holt concluded that Plaintiff had a "very clinical history of carpal tunnel, but relatively unremarkable EMG 6 months ago." Tr. 572. Dr. Holt recommended arthroscopic surgery regardless of the results from the next EMG. Tr. 572.

On January 5, 2010, Plaintiff saw Dr. Holt. Tr. 569. Plaintiff reported nocturnal paresthesias and that "any vibration such as a weedwhacker or a weed eater really accentuates it." Tr. 569. Plaintiff also reported that he drove a truck to plow or occasionally shoveled, which both accentuate his wrist problems. Tr. 569. Dr. Holt diagnosed Plaintiff with carpal tunnel syndrome and there was no evidence of "any progression" from April of 2009. Tr. 570. Plaintiff reported he did not want to have a surgery and that he would rather wear his splints, which he found to be beneficial. Tr. 569-70.

### d.  Record from Plaintiff's Application for DIB

#### i.  Disability Report

On December 23, 2004, Plaintiff completed his first disability report.  Tr. 171-78. Plaintiff reported as follows: He had torn cartilage in his right knee, which limited his ability to work.  Tr. 172. His condition restricted his ability to stand or walk for extended periods of time, and he could not kneel. Tr. 172. His condition began to bother him in July 2004, and he became unable to work in October 2004. Tr. 172. After his condition

began to bother him, he worked about one month. Tr. 172. Plaintiff reported that he stopped working because he had surgery on October 5, 2004. Tr. 172. Plaintiff reported that he took ibuprofen for pain. Tr. 177.

On February 16, 2005, Plaintiff completed a second disability report. Tr. 179-87. Plaintiff reported as follows: Since his last disability report, his knee had been swelling; he had been experiencing significant pain; and he could only stand one-half hour. Tr. 182. His other knee has been giving him problems and he had hypertension. Tr. 182. All of these changes occurred in December 2004. Tr. 182. Since his last disability report, he had new "limitations," including: knee swelling, knee pain, high blood pressure, emotional distress, trouble walking on uneven ground and slippery conditions, and difficulty standing more than one-half hour. Tr. 183. His conditions affected his ability to care for his personal needs. Tr. 186. For example, he had difficulty getting in and out of the bathtub and vehicles; he could not walk for long periods of time; he could not stand more than one-half hour; and he could sit, but he needed to elevate his leg. Tr. 186.

On April 26, 2007, Plaintiff completed a third disability report. Tr. 199. Plaintiff reported that his conditions were bilateral knee problems, "heart problems," high blood pressure, and depression. Tr. 201. Plaintiff reported that he "cannot lift too much," "stand for too long," crawl, or kneel. Tr. 201. Plaintiff reported that he had to miss days of work because his physical health problems. Tr. 201.

On October 23, 2007, Plaintiff completed a fourth disability report. Tr. 237. Plaintiff reported no changes since his last report. Tr. 237-42.

Plaintiff completed a fifth disability report. Tr. 273-79.  Plaintiff reported that since January 1, 2008, the pain in his knee had increased, and his depression had increased. Tr. 274. Plaintiff reported that since his last report it took him "longer to get going in the morning" and he could not stand and wash dishes. Tr. 277.

### ii.  Function Reports

On May 11, 2007, Plaintiff completed a function report. Tr. 214-21. Plaintiff reported about his activities as follows: His daily routine consisted of stretching, watching television, visiting his father or sister, caring for his dog, and taking a short walk of one block or less.  Tr. 214, 218-19.  He had to be slow and careful when dressing, bathing, caring for his hair, shaving, feeding himself, and using the toilet. Tr. 215. He visited his family three to four times per week. Tr. 218. He went outside four to five times per week. Tr. 217.  He could drive, but he needed to stop every 20 to 30 minutes to stretch. Tr. 217.  He prepared his own meals three to four times per week. Tr. 216. He did dishes three times per week, but otherwise he did not do household chores because of his knee pain, his legs got tired, and he was afraid to fall down. Tr. 216-17. Prior to the onset of his condition, he would barbecue, garden, ice fish, hunt, climb, and repair automobiles. Tr. 215.

Plaintiff reported about his limitations as follows: His knee pain caused him to wake often. Tr. 215. Plaintiff reported that he had problems lifting, squatting, bending, standing five to ten minutes, reaching, walking, kneeling, hearing, climbing stairs, and using his hands. Tr. 219. Plaintiff needed to elevate his legs after walking. Tr. 219. Plaintiff wore a prescribed brace on his right leg. Tr. 220.

Plaintiff's wife also completed a third-party function report. Tr. 223. Her report is consistent with Plaintiff's function report. Tr. 223-30.

Plaintiff completed a second function report. Tr. 244-51. Plaintiff reported the following changes: He no longer took care of any people or pets. Tr. 245. He had no problems with personal care. Tr. 245.  Plaintiff made his own meals less often—two times per week. Tr. 255. His wife and daughter did the house and yard work. Tr. 247. Everyday Plaintiff read the newspaper, talked on the telephone, and watched television. Tr. 248. Plaintiff also reported that he wore braces on his wrist. Tr. 250. Plaintiff's wife also completed a second third-party function report. Tr. 253-60. Her second third-party function report is consistent with Plaintiff's second function report. In completing her report, she repeatedly noted that Plaintiff's knees hurt and swelled such that he needed to elevate his legs. Tr. 254, 258, 260.

On November 9, 2007, Plaintiff completed a third function report. Tr. 262. Plaintiff's third function report was substantially similar to his second report. Tr. 264. Plaintiff reported that he had swelling in his right knee when he did "a lot of walking." Tr. 269. Plaintiff reported that his back would get tired if he stood, but the x-rays of his back have never revealed a problem. Tr. 269.

### iii.  Physical Residual Functional Capacity Assessments

On February 1, 2005, Dr. Phibbs Cliff performed a physical RFC assessment. Tr. 365. Dr. Cliff concluded that Plaintiff could occasionally lift 50 pounds, frequently lift 25 pounds, stand at least 6 hours in an eight-hour day, sit at least six hours in an eight-hour day, and push and pull without any limitations. Tr. 366. Dr. Cliff listed Plaintiff's only

postural limitation as follows: Plaintiff could only occasionally climb a ladder and could only occasionally crouch. Tr. 367. Dr. Cliff noted that in the examination on December 5, 2004—following Plaintiff's arthroscopic surgery—Plaintiff had full extension and flexion, and no effusion in his right knee. Tr. 366. Dr. Cliff further noted that Plaintiff returned to work with limitation that he not lift over 50 pounds and he not do a lot of jumping. Tr. 366. Larson Daniel reviewed all of the evidence in the file and affirmed the RFC assessment as written. Tr. 192.

On August 22, 2007, Dr. Howard Atkin completed a second physical RFC assessment. Tr. 460-470. Dr. Atkin listed Plaintiff's conditions as a "tear of the medial meniscus of the right knee" and "coronary artery disease involving the right coronary artery and the left circumflex artery with a normal left ventricular ejection fraction (greater than 65%)." Tr. 470. Dr. Atkin concluded that Plaintiff could occasionally lift 20 pounds, frequently lift ten pounds, stand six hours in an eight-hour day, and sit six hours in an eight-hour day. Tr. 464. Dr. Atkin also concluded that Plaintiff could only occasionally kneel and crawl, and that Plaintiff should avoid exposure to extreme cold. Tr. 467. On December 3, 2007, Dr. James Stevenson affirmed the assessment that Plaintiff could perform light work as it was written. Tr. 491.

On April 30, 2009, Alberto Esparza stated that "[a]ll of the evidence in the claims folder has been reviewed, and a fully favorable determination cannot be made at this time." Tr. 283.

### iv.  Psychiatric Review Technique

On August 29, 2007, Dr. R. Owen Nelson completed a psychiatric review technique. Tr. 471. Dr. Nelson concluded that Plaintiff had no medically determinable mental impairment. Tr. 471. Dr. Nelson concluded that while Plaintiff claimed depression, the medical record made no mention of depression and Plaintiff was not taking any medication for depression. Tr. 483. On December 4, 2007, Dr. Russell J. Ludeke reviewed all of the evidence in the file and the assessment of Dr. Nelson, and affirmed the assessment as written. Tr. 492-94.

### v.  Administrative Hearing

October 22, 2009, Plaintiff appeared for a hearing before an ALJ. Tr. 23. Mary A. Harris testified as the vocational expert. Tr. 119 (professional qualifications).

Plaintiff testified as follows: In 2004 he was "retired" by the Minnesota of Department of Transportation after his knee surgeries. Tr. 26. For a while after his retirement, he looked for some light work, but he cannot do much standing and heavy lifting. Tr. 27. During the typical day, Plaintiff watches television and feeds his dog. Tr. 27. He sits in his chair quite a bit and elevates his legs daily. Tr. 29. He can do dishes "a little bit," he can mow the lawn 15 minutes, and if he goes grocery shopping he must sit in the vehicle and wait for his wife. Tr. 30. He can lift 15 pounds, stand one half hour, and walk to the mail box. Tr. 31. He estimated that he could stand for two hours in an eight-hour shift. Tr. 31. He received from no benefits from physical therapy or cortisone injections. Tr. 28. Plaintiff's knees swell if he stands a lot, walks a lot, or lifts heavy objects. Tr. 28. After his knees swell, he needs to sits down and elevate his legs. Tr. 28.

The swelling goes away after 30 minutes. Tr. 29. He drives some, but driving causes pain in his knee. Tr. 29. When Dr. Malkovich filled out the "disability form," Plaintiff was in the room and Dr. Malkovich asked Plaintiff about his limitations. Tr. 32.

The ALJ presented Ms. Harris with the hypothetical man, who was approximately 50-years old, had degenerative joint disease of the right knee, history of left knee surgery, treatment for coronary artery disease, diagnosis of the degenerative disc disease of the lumbosacral spine, and a history of bilateral carpal tunnel syndrome. Tr. 33. The ALJ limited this hypothetical man to light work, occasionally lifting up to 20 pounds, frequently lifting 10 pounds or less, no climbing of ladders, ropes, or scaffolds, and occasional crouching. Tr. 33. Ms. Harris testified that this individual would not be able to perform Plaintiff's past work. Tr. 33.

The ALJ presented Ms. Harris with a second hypothetical man who was similar to the first hypothetical man and the second man could not be exposed to extreme colds. Tr. 33. Ms. Harris testified that such a hypothetical individual could work as a machine operator or cashier. Tr. 34. Ms. Harris also testified that if the first hypothetical individual was limited to standing only two hours in an eight-hour day, then such an individual could probably perform sedentary work. Tr. 34.

## III.   ANALYSIS

### a.  Standard of Review

Review by this Court is limited to a determination of whether the decision of the ALJ is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); *Murphy v. Sullivan*, 953 F.2d 383, 384 (8th Cir. 1992).  Substantial evidence is "such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971) (quotation omitted). "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings." *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987). "Substantial evidence on the record as a whole, . . . requires a more scrutinizing analysis." *Id.* (quotation omitted).

The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion. *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994); *see also Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993) (stating that the ALJ's determination must be affirmed even if substantial evidence would support the opposite finding). Instead, the Court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." *Gavin*, 811 F.2d at 1199. In reviewing the record for substantial evidence, the Court may not substitute its own judgment or finding of facts. *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir.1993). If it is possible to reach two inconsistent positions from the evidence, then the court must affirm that decision. *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir.1992).

To be entitled to DIB, a claimant must be disabled. 42 U.S.C. § 423(a)(E). A "disability" is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* at § 423(d)(1)(A); *see also* 20 C.F.R. § 404.1505. The Social Security Administration

adopted a five-step procedure for determining whether a claimant is "disabled" within the meaning of the Social Security Act. 20 C.F.R. § 404.1520(a)(4).  The five steps are: (1) whether the claimant is engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) whether the claimant can return to his or her past relevant work; and (5) whether the claimant can adjust to other work in the national economy. *Id.* at § 404.1520(a)(5)(i)-(v). The claimant has the burden of proof to show he or she is disabled through step four; at step five, the burden shifts to the Commissioner. *Snead v. Barnhart*, 360 F.3d 834, 836 (8th Cir. 2004); *see also* 20 C.F.R. § 404.1512(a); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991).

### b.  RFC Determination: Weight of Medical Opinions

In steps four and five, the ALJ assesses an individual's residual functional capacity (RFC). 20 C.F.R. § 404.1520(a)(4)(iv). RFC is defined as the most a claimant can do despite the limitations of the individual's impairments. *Id.* at § 404.1545(a)(1). In assessing RFC, the ALJ must consider "all of the relevant medical and other evidence." 20 C.F.R. § 505.1545(a)(3). "RFC is a medical question, and an ALJ's finding must be supported by some medical evidence. The ALJ, however, still bears the primary responsibility for assessing a [Plaintiff's RFC] based on all relevant evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 803 (8th Cir. 2005) (citations and quotation omitted.)

Medical evidence includes "medical opinions." 20 C.F.R. § 404.1527(b). An ALJ must consider medical opinions from treating and nontreating sources, *id.* at § 404.1527(d), and an "ALJ must resolve conflicts among the various opinions." *Heino v.*

*Astrue*, 578 F.3d 873, 879 (8th Cir. 2009).   "A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight.  By contrast, the opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence."  *Jenkins v. Apfel*, 196 F.3d 922, 924-25 (8th Cir. 1999) (quotations omitted).   Thus, "[w]hen an ALJ discounts a treating physician's opinion, he should give good reasons for doing so."  *Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007) (quotation omitted).  For example, "a treating physician's opinion is afforded less deference when the medical evidence in the record as a whole contradicts the opinion."  *Howe v. Astrue*, 499 F.3d 835, 839 (8th Cir. 2007) (citation and quotation omitted); *see* 20 C.F.R. § 404.1527(d)(6) (stating that the ALJ must consider "any factors . . . which tend to support or contradict the [treating physician's] opinion.").  Likewise, "conclusory opinions not backed by medically acceptable clinical and laboratory diagnostic data carry limited weight in the disability analysis."  *Casey v. Astrue*, 503 F.3d 687, 694 (8th Cir. 2007).  Furthermore, "an ALJ may credit other medical evaluations over that of the treating physician when such other assessments are supported by better or more thorough medical evidence."  *Heino*, 578 F.3d at 879.

In reaching the RFC determination in the present case, the ALJ did not give controlling weight to the opinion of Dr. Malkovich because his opinion was (1) not *well supported* by objective medical findings, (2) based largely on Plaintiff's subjective complaints, which the ALJ determined were not credible, and (3) inconsistent with Plaintiff's activities of daily living. Tr. 13.  Instead, the ALJ gave significant weight to

the opinion of the agency medical consultants because they are generally consistent with record. Tr. 13.

Plaintiff argues that ALJ erred in his weighing of the medical opinions, arguing that general consistency "with the above-described residual functional capacity" is an improper criterion for weighing a medical opinion. Pl.'s Mem. at 12. Plaintiff also contends that the ALJ should have considered the rationale of the state agency consultants and without such consideration the opinions of the state agency consultants cannot rise to the level of "some medical evidence." *Id.* at 13-14. For the reasons set forth below, this Court concludes that the ALJ did not err in weighing the medical opinion and the ALJ's decision is based upon substantial evidence on the record as a whole.

### i. Dr. Malkovich's Opinion

The ALJ did not err in weighing Dr. Malkovich's opinion. The ALJ's conclusion that Dr. Malkovich's opinion is not well supported by the "clinical findings, laboratory diagnostic techniques and other substantial evidence of record," Tr. 13, is a valid basis for discounting the opinion of a treating physician. *See* Social Security Ruling 96–2P, *Policy Interpretation Ruling Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions*, 1996 WL 374188 (July 2, 1996). This is particularly true for Plaintiff's carpal tunnel syndrome, coronary artery disease, and degenerative disc disease of the lumbar spine—where no objective medical evidence supports that Plaintiff's conditions preclude him from light work. *See* Tr. 358, 363, 511, 520, 566, 572 (carpel tunnel syndrome); Tr. 394, 421-30, 447-48, 531, 533-43, 555, 561 (coronary artery disease); Tr. 544, 561 (degenerative disc disease of the lumbar spine).

Plaintiff contends that Dr. Malkovich's opinion is supported by objective medical evidence in the form of the MRI results.  Dr. Malkovich cited MRI results in his 2008 opinion. But, as noted by the ALJ, Dr. Malkovich's review of the MRI results supports that Plaintiff can perform modified sedentary work. *See* Tr. 194, 195, 355, 451. Moreover, as of 2008, the most recent MRI was done in November 2006. *See* Tr. 419, 454. The November 2006 MRI showed the Plaintiff's left leg was normal and the condition of Plaintiff's right knee was consistent with the MRI done in January 2006. Tr. 490, 453. Dr. McLeod reviewed the MRI from January 2006, examined Plaintiff, and concluded that the January 2006 MRI was consistent with the June 2005 MRI, and further concluded that Plaintiff had no joint effusion, good range of motion, and Plaintiff could manage his pain with over-the-counter medication. Tr. 409. Dr. McLeod's examinations findings are consistent with Dr. Ritts's examination findings from June 2005 when he reviewed the June 2005 MRI. Tr. 391. Therefore, the ALJ did not err in concluding that the objective medical evidence—such as MRI results—was generally more consistent with the opinions of the state agency consultants. *See infra* § III.b.ii.

Plaintiff also contends that Dr. Malkovich's opinion is supported by his examinations. While the record contains some notes of Dr. Malkovich's observations from examinations, the ALJ's concluded that Dr. Malkovich's opinion was largely based on Plaintiff's subjective statements.  This is a valid basis for not giving controlling weight to the opinion of a treating physician. *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000). Moreover, the ALJ's conclusion is supported by substantial evidence in the record as a whole (see, e.g., Tr. 355, 447, 449, 451, 505), not the least of which is Plaintiff's

testimony at the administrative hearing that Dr. Malkovich relied on Plaintiff's subjective description to formulate Plaintiff's limitations. Tr. 32. Plaintiff does not challenge the ALJ's credibility determination for his statements and testimony.

### ii. State Agency Consultants' Opinions

The ALJ did not err in weighing the opinions of the state agency consultants. Plaintiff interprets the ALJ's statement that "[t]he opinion[s] of the State agency medical consultants [are] generally consistent with the above-described residual functional capacity" to mean that the ALJ first determined the RFC and then granted greater weight to the state agency consultants because their opinions were most consistent with the ALJ's determination. This Court does not adopt this reading or reasoning.

As used by the ALJ, the phrase "generally consistent" acknowledges that there is evidence in the record contrary to the opinion of the state agency consultants. But, the "ALJ must resolve conflicts among the various opinions" *Heino*, 578 F.3d at 879, and this Court must affirm even if evidence may exist to support the opposite conclusion. *Mitchell*, 25 F.3d at 714. Thus, the presence of some evidence to the contrary is not determinative if the opinions of the state agency consultants are supported by substantial evidence. Furthermore, as used by the ALJ, the phrase "the above-described residual functional capacity" refers to the ALJ's review of the objective medical evidence and Plaintiff's activities of daily living. Thus, the ALJ was simply stating that the opinions of the state agency consultants are consistent with the objective medical evidence and Plaintiff's activities of daily living that were summarized in the ALJ's opinion.

Contrary to Plaintiff's contentions, the ALJ considered the degree to which the state agency consultants' opinions support their opinions. *See* Pl.'s Mem. at 12. The ALJ considered the degree to which they supported their opinions when he determined that their opinions should be further restricted in part and less restricted in part based upon other evidence in the record. Tr. 13.

The opinions of the agency consultants are supported by substantial evidence on the record as whole. First, the opinions of state agency consultants are "generally consistent" with objective medical evidence in the record. *See* Tr. 13. As to Plaintiff's knees, the opinions of the state agency consultants are consistent with the opinion of Dr. McLeod, *see* Tr. Tr. 327, 334-38, 402-06, 408, 409; Dr. Ritts, Tr. 391; Dr. Romano, *see* Tr. 561; and Dr. Goldschmidt. Tr. 390, 453. Second, their opinions are also consistent with Plaintiff's ability to manage his symptoms with medication. *See* Tr. 177, 409, 557, 562; *see also Brace v. Astrue*, 578 F.3d 882, 885 (8th Cir. 2009) ("If an impairment can be controlled by treatment or medication, it cannot be considered disabling."). Finally, their opinions are generally consistent with Plaintiff's ability to perform daily activities, which has substantial support in the record. *See, e.g.*, Tr. 29-31, 214, 215, 217-19, 245, 248, 269, 446, 450, 527, 557, 569, 572; *see Brown v. Astrue*, 611 F.3d 941, 955 (8th Cir. 2010) (holding that an ALJ does not err in not giving controlling weight to treating physician in part where claimant's daily activities supported the find that claimant can perform light work).

Therefore, for the reasons set forth above, this Court concludes that the ALJ did not err in weighing the medical opinions and the ALJ's weighing of the medical opinions is supported by substantial evidence in the record as a whole.

### c. RFC Determination: Hypothetical Question

"A vocational expert's testimony based on a properly phrased hypothetical question constitutes substantial evidence." *Haggard v. Apfel*, 175 F.3d 591, 595 (8th Cir. 1999) (quotation omitted). "The ALJ's hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole." *Hinchey v. Shalala*, 29 F.3d 428, 432 (8th Cir.1994).

Plaintiff does not contend that any element of the hypothetical that was posed was erroneous. Rather, Plaintiff contends that the ALJ failed to include the limitation that the Plaintiff cannot be on his feet for more than two hours in an eight-hour day. Pl.'s Mem. at 15-16. Having reviewed the record and the hypothetical, this Court concludes that the hypothetical was properly phrased because it includes those impairments that the ALJ found are supported by substantial evidence in the form the state agency consultants' opinions, objective medical evidence, and Plaintiff's activities of daily living. In contrast, the contention that Plaintiff is unable to stand on his feet for more than two-hours in an eight-hour day is not supported by substantial evidence. It is only supported by Dr. Malkovich's 2008 opinion and Plaintiff's own subjective testimony. For the reasons set forth earlier, the ALJ did not err in weighing Dr. Malkovich's opinion, and Plaintiff does not challenge the ALJ's determination of Plaintiff's credibility.

Therefore, this Court concludes that the ALJ's hypothetical is supported by substantial evidence in the record as a whole. For all of the reasons set forth herein, this Court concludes that the ALJ's RFC determination is supported by substantial evidence in the record as a whole.

## IV.   RECOMMENDATION

Based upon the record and memoranda, **IT IS HEREBY RECOMMENDED** that:

1. Plaintiff's Motion for Summary Judgment (Docket No. 12) be **DENIED**;

2. Commissioner's Motion for Summary Judgment (Docket No. 14) be **GRANTED**; and

3. The Clerk of Court be directed to enter judgment accordingly.


Dated:   ____February 1, 2012____                _____*s/ Tony N. Leung*_____
                                                                        Tony N. Leung
                                                                        United States Magistrate Judge


Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and by serving upon all parties written objections that specifically identify the portions of the Report to which objections are made and the basis of each objection.   This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals.   Written objections must be filed with the Court before **February 15, 2012**.